**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| PHILLIP CROW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 07-0740-KD-C |
| | ) | |
| COOPER MARINE & TIMBERLANDS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This matter came before the Court for a non-jury trial on July 9, 2009.  Upon consideration of the documentary and testimonial evidence presented at trial and all other pertinent portions of the record, the Court makes the following conclusions of law and findings of fact.

**I.    Procedural Background**

This action is comprised of a Jones Act, 46 U.S.C. § 30104 claim for negligence and maritime claims for unseaworthiness, maintenance, cure, and lost wages, which fall within meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Accordingly, this Court's jurisdiction obtains pursuant to 28 U.S.C. §§ 1331 & 1333.

On October 15, 2007, Plaintiff Phillip Crow ("Plaintiff" or "Crow") initiated this litigation by filing a Complaint against Cooper Marine & Timberlands Corp. ("Defendant" or "Cooper Marine"), a wholly owned subsidiary of Cooper/T. Smith Corporation. (Docs. 1, 10).  Plaintiff seeks recovery for damages allegedly caused when Crow "injured his left knee when he slipped while stepping onto the port push knee of [Defendant's . . .] vessel [the CRIMSON WHITE] because Cooper Marine failed to provide a safe means of ingress and egress to the vessel."  (Doc. 73).

Plaintiff claims that the following amounts are due and owing from Defendant:

(1) $33,201.04 worth of past lost wages; (2) $435,000.00 as compensation for past and future pain and suffering; and (3) $ 12,140.00 of maintenance[1] payments owed for the time period October 17, 2007 to June 30, 2009.  As such, Plaintiff seeks recovery of the sum of $ 480,341.04, plus attorney's fees and punitive damages.

## II.   Conclusions of Law

### A.   Jones Act Negligence

To recover under the Jones Act for negligence , Plaintiff must prove each of the following by a preponderance of the evidence:

> (1)   that at the time of the alleged injury the Plaintiff was acting in the course of employment as a member of the CRIMSON WHITE's crew;

> (2)   that Cooper Marine was "negligent" as claimed; and

> (3)    that such negligence was a "legal cause" of damage sustained by the Plaintiff.

46 U.S.C. § 30104; Stewart v. Dutra Const. Co., 543 U.S. 481, 487 (2005); Cain v. Transocean Offshore USA., 518 F.3d 295, 298 (5th Cir. 2008).

### B.   Unseaworthiness

In order to prevail on a claim of unseaworthiness, Crow must prove each of the following by a preponderance of the evidence:

> (1)   that the vessel was unseaworthy, as claimed; and

> (2)   that the unseaworthy condition was a legal cause of damage to the Plaintiff.

Stewart, 543 U.S. at 487 (citing The Osceola, 189 U.S. 158 (1903)).

---

[1]The parties stipulated in their Joint Pretrial Document that Defendant had already paid certain items Plaintiff claimed as cure.  (Doc. 73).  Plaintiff's Post-Trial Memorandum does not include any claim for additional cure.  (Doc. 84).

C.    **Maintenance and Cure**

**1.**    A shipowner is obliged to pay "[m]aintenance and cure" as a result of "the contract between the seaman and the shipowner or vessel, to pay a seaman, who is ill or injured while in the service of a ship, 'wages to the end of the voyage and subsistence, lodging and care to the point where the maximum cure attainable has been reached.'" Bloom v. Weeks Marine, Inc., 225 F.Supp.2d at 1335 (M.D. Fla. 2002) (quoting Norris, supra, at § 26:2).

**2.**    A vessel owner's duty to provide maintenance and cure embraces not only the obligation to provide a subsistence allowance and to pay for medical expenses actually incurred by the seaman, but to take all reasonable steps to insure that the seaman, when he is injured or becomes ill, receives proper care and treatment. Gaspard v. Taylor Diving & Salvage Co., Inc., 649 F.2d 372, 375 (5th Cir. 1981); Boudreaux v. United States, 280 F.3d 461, 468 (5th Cir. 2002); Guevara v. Maritime Overseas Corp., 59 F.3d 1496, 1500 (5th Cir. 1995).

**3.**    To recover for maintenance and cure, Crow must show that:

(a)    an injury or illness occurred while Plaintiff was in the service of the vessel on which the Plaintiff was employed as a seaman; and

(b)    the injury or illness occurred without willful misbehavior by Plaintiff.

Stevens v. McGinnis, 82 F.3d 1353, 1357-58 (6th Cir. 1996); Bloom v Weeks Marine, Inc., 225 F.Supp.2d 1334, 1335 (M.D. Fla. 2002) (citing 2 Martin J. Norris, The Law of Seamen § 26:1 (4th ed. 1985)); Adams v. Texaco, Inc., 640 F.2d 618, 620 (5th Cir. 1981)[2]; Garay v. Carnival Cruise

---

[2]Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on the Eleventh Circuit. Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Line, Inc., 904 F.2d 1527, 1530 (11th Cir. 1990).

       **4.**     A seaman is not barred from recovering maintenance and cure when he is "forced by financial necessity to return to his regular employment." Vaughan v. Atkinson, 369 U.S. 527 (1962); Yates v. Dann, 223 F.2d 64, 67 (3d Cir. 1955); Koslusky v. United States, 208 F.2d 957 (2d Cir. 1953).

       **5.**     However, an vessel owner who has dutifully paid maintenance and cure up until the time an injured seaman resigns from his or her employ is not bound to pay maintenance during subsequent periods when the seaman is employed in his or her accustomed trade by another vessel but has not yet reached maximum medical improvement:  when a seaman is "fit enough to work by his own choice in his accustomed trade, there is no reason to award him maintenance for periods in which his sustenance was provided by others," if "such employment is by the seaman's choice and not a result of the original employer's willful failure to perform its maintenance and cure obligations." Dowdle v. Offshore Express, Inc., 809 F.2d 259, 266 (5th Cir. 1987) (citing Johnson v. United States, 333 U.S. 46, 50 (1948)); see also Koslusky, 208 F.2d at 958 (affirming a maintenance award that "exclud[ed] of course periods when the [seaman] was hospitalized and when he was serving on [a] second ship.").  The original vessel owner must pay maintenance during any periods of unemployment that predate maximum medical improvement. Koslusky, 208 F.2d at 958.

       **6.**     The original shipowner's obligation to pay cure, that is medical expenses and the cost of medical treatment, continues unabated despite a seaman's re-employment. See Koslusky, 208 F.2d at 958; Dowdle, 209 F.2d at 266 (affirming the district court's cure award, which covered a treatment that had been paid for by the seaman under his private insurance policy, rather than by another employer).

      7.     If a vessel owner acts "in bad faith, callously, or unreasonably" in refusing to

pay maintenance and cure, he becomes liable to the seaman for attorney's fees.  Flores v. Carnival

Cruise Lines, 47 F.3d 1120, 1127 (11th Cir. 1995).  In particular, laxness in investigating a claim

for maintenance and cure supports an award of attorney's fees.  Hines v. J.A. LaPorte, Inc., 820 F.2d

1187, 1189 (11th Cir. 1987).

      8.     When a vessel owner abrogates an established legal duty, he or she exhibits

willful and wanton misconduct justifying an award of punitive damages.  Flores v. Carnival Cruise

Lines, 47 F.3d 1120, 1127 (11th Cir. 1995) (citing Hines v. J.A. Laporte, Inc., 820 F.2d 1187, 1188

(11th Cir.1987)).

## III.   Findings of Fact

     At trial, the parties presented documentary evidence and the deposition testimony of William

"Bo" Butler, who was employed as a deckhand aboard Defendant's vessel the CRIMSON WHITE

and who worked with Plaintiff on that boat (Pl.'s Tr. Exh. 15); Captain Leland Kyle Thorn, who

worked alongside Plaintiff aboard Defendant's vessel the NONNIE (Pl.'s Tr. Exh. 16); Dr. Steven

Andrews, M.D., a physician practicing emergency medicine who conducted a merchant mariner

physical examination of Crow prior to his employment by Defendant (Pl.'s Tr. Exh. 10 and Exh. 1

to Andrews Dep.); Dr. Raymond Lee Nichols, M.D., an orthopedic surgeon practicing at Shoals

Orthopedic, who operated on Plaintiff's left knee on or about August 20, 2007 (Pl.'s Tr. Exh. 11);

and Dr. Jay R. Solorio, M.D., an orthopedic surgeon who performed surgery on Plaintiff's left knee

on March 27, 2009 (Pl.'s Tr. Exh. 13).  The parties also introduced portions of the deposition

testimony of Dr. Donald E. Beach, M.D., a family medicine practitioner who treated Crow's left

5

knee pain and referred Plaintiff for treatment of his left knee pain to both Shoals Orthopedic, P.C. and Dr. Solorio. (Pl.'s Tr. Exh. 12).  Live testimony was presented by Plaintiff Phillip Crow, who Defendant employed as pilot of Cooper Marine's vessel the CRIMSON WHITE at the time of the alleged accident; Captain Richard "Ricky" E. Wyatt, Captain of the CRIMSON WHITE; Marcus Hood, Deckineer aboard the CRIMSON WHITE; Gerald Bowe, a former deckhand aboard the CRIMSON WHITE; and Bobby Wayne ("Bob") Pittman, Vice-President and Claims Director for the Cooper Group of Companies.  Below, the Court sets forth its findings of fact in this case, based upon the testimony and evidence submitted at trial.

A.    **Plaintiff's Background**

The court accepts as true the following account of Plaintiff's professional and health background, which is based primarily on Plaintiff's testimony and is uncontradicted by any evidence adduced at trial.

Plaintiff began working in the towing industry in 1986 or '87 as a deckhand.  Over the subsequent twenty some-odd years, Crow worked for a series of towing companies on a number of different boats, rising through the ranks of second mate, first mate,  steersman, pilot, and captain. At the time of the alleged accident, Plaintiff was employed by Cooper Marine as a pilot aboard the M/V CRIMSON WHITE.

Plaintiff first came to work for Cooper Marine as a contract pilot on or about January 24, 2006. Before he began work, Defendant required Crow to undergo a merchant mariner physical examination.  Dr. Stephen Andrews performed this exam on January 23, 2006.  On or about March 21, 2006, Cooper Marine retained Crow as a full-time pilot with a repeating schedule of 28 consecutive days working on the boat, followed by 14 days off the boat.  For a time, Plaintiff was

6

a "floater pilot," working full-time, but not always on the same vessel.  Eventually, Crow received a regular assignment aboard Defendant's vessel the NONNIE.

Before coming to work for Cooper Marine, Plaintiff never had any physical problems with either of his knees, never had a doctor treat him for knee problems, and never sustained any injury to his left knee.

While he was employed by Defendant as a full-time pilot during June of 2007, Plaintiff injured his right knee at a water park during a vacation in Gulf Shores.  Crow's family physician, Dr. Donald Beach, referred him to Dr. Jay Solorio for surgery on his right knee following that accident. Plaintiff completed a course of physical therapy, and Dr. Solorio released him to return to work without restriction on or about July 5, 2007.  (Pl.'s Tr. Exh. 6).  Following this release Crow returned to work on the NONNIE wearing a brace on his right leg.

### B.   August 12, 2007 Aboard the Crimson White

On August 7, 2007, Plaintiff joined the crew of Defendant's vessel the CRIMSON WHITE. (Pl. Tr. Testimony).  Other members of the crew on that trip included Captain Richard "Ricky" Wyatt, Deckineer Marcus Hood, Deckhand Gerald Bowe, and Deckhand William "Bo" Butler. Captain Wyatt and Crow each worked six-hour shifts during which they would alternately assume control of the vessel and sleep and/or relax.  When Captain Wyatt was working, Crow was off-duty, and vice-versa.  (Id.)  When Plaintiff boarded the CRIMSON WHITE, he was wearing a brace on his right knee.  (Id.; Wyatt Tr. Testimony).

Sometime between August 7 and August 12, 2007, Plaintiff visited a Wal-Mart store in Daphne with fellow crew member Gerald Bowe.  (Pl. Tr. Testimony; see also Bowe Tr. Testimony). As the two men left the store, Crow slipped and fell on the parking lot pavement.  (Id.)

7

On August 12, 2007, the CRIMSON WHITE towed eight barges upriver from Mobile, docked at Bay Springs and then Yellow Creek.  (Id.)  After arriving at Yellow Creek, Plaintiff left the CRIMSON WHITE for about twenty to thirty minutes sometime between 6 and 6:30 p.m. to purchase drinks and snacks for the vessel's crew.  (Id.)  Crow was "off watch" when he left the boat on the errand.  (Id.)  At that time, the crew was waiting at dock in Yellow Creek while an electrician checked a generator in the engine room.  (Id.)  Plaintiff was in the galley with all of the deckhands who "mentioned something about getting some drinks" and Plaintiff agreed to leave the boat to purchase them for the group.  (Id.)  Plaintiff stopped by the engine room, where Captain Wyatt, the electrician Jim Armstrong ("the electrician"), and one deckhand who may have been Gerald Bowe were gathered.  (Id.)  Crow borrowed the electrician's keys and truck to pick up the drinks and snacks.  (Id.)  Plaintiff did not remember how many cases of cold drinks he purchased, but estimated that he bought four or five cases and several bags of candy and snacks.  (Id.)  Plaintiff recalled carrying some Baby Ruth or Snickers candy bars up to the wheelhouse.  (Id.)

Crow testified that when he returned to the dock at Yellow Creek he was holding two 12-packs of drinks in his left hand and a plastic bag with strings over his right wrist.  Crow alleged that when he stepped down on the CRIMSON WHITE's tow knee, his foot slipped just as it hit the surface of the tow knee.  (Id.)  Crow further alleged that heard his "left knee pop and grind and make [*sic*] an enormous noise and severe pain[,] and cold drinks went across the catwalk and [Crow] fell onto the catwalk and—cold drinks went across the catwalk and [he] got up the best [he] could." (Id.)  Crow stated that no one was present when he fell, instead, "[e]veryone was . . . in the galley when [he] went in the galley" immediately after the accident.  (Id.)

Plaintiff testified that after telling Captain Wyatt and the rest of the assembled crew about

his fall, Crow used the boat phone to call Douglas Hall, who was Cooper Marine's personnel supervisor at the time.  (Id.)  Plaintiff told Douglas Hall that he had hurt his knee and said, "I think I need to go to the doctor and get it took care of."  (Id.)  On August 13, 2007, Plaintiff filled out an accident report documenting his alleged fall, which Captain Wyatt signed.  (Id.; Jt. Tr. Exh. 3).  Crow also testified that he noted the incident in the vessel's logbook, writing on the side margin of the boat's log book entry for August 12, 2007, "Att: Crow hurt Left Knee!," and signing "P. Crow" underneath.  (Pl.'s Tr. Exh. 9).  Plaintiff completed his next watch and stayed on the boat until August 14, 2007.  (Pl. Tr. Testimony).  Plaintiff alleges that he experienced severe knee pain while completing the trip.  (Id.)

As explained below, Crow's testimony is in many respects controverted by the his own previous testimony as well as testimony of others aboard the CRIMSON WHITE that day.   The Court finds, as explained fully below, that Plaintiff's testimony lacks credibility on a number of specific points of fact.

During his testimony regarding the events of August 12, 2007, Plaintiff contradicted himself. Crow testified that after the accident, he went straight to the galley where he told the crew about the accident and called Doug Hall.  From the galley, Plaintiff testified that he went directly to his room. However, that testimony is contradicted by Plaintiff's earlier testimony during trial that he recalled carrying some Baby Ruths or Snickers up to the wheelhouse after the accident.

The testimony Plaintiff offered at trial is also partially contradicted in at least two ways by his deposition testimony.  Specifically, Plaintiff testified at trial that "[e]veryone was . . . in the galley when [he] went in the galley" immediately after the accident, and also stated in his deposition that he went "straight to the galley" after the alleged accident  (Pl. Dep. 48:12-13).  However, when

Crow was asked during his deposition "who was in the galley" at that time, he answered, "No one." (Id. 49:1-3). Instead, Crow stated in his deposition that after putting the drinks and the candy down in the galley, he "went to the lower engine room" where a black deckhand, the electrician, and the captain were assembled. (Id. 49:8-14). Moreover, although Plaintiff testified at trial that he recollected telling the deckhands, including Gerald Bowe and Bo Butler that "[he] had fell out there getting onto the boat," he stated in his deposition that he did not talk to any of the other deckhands about what happened. (Id. 50:10-12).

Plaintiff's testimony is also materially contradicted by the trial testimony of Richard "Ricky" Wyatt, who served as Captain of the CRIMSON WHITE on August 12, 2007, and has occupied that position for more than three years. Specifically, Plaintiff testified at trial that he never told Captain Wyatt that his left knee would require an operation. (Pl. Tr. Testimony). However, Captain Wyatt testified that when Crow boarded the CRIMSON WHITE for the first time he told the Captain that "he [(Crow)] had just had surgery on his right leg and he was going to have to have his other one worked on." (Wyatt Tr. Testimony.) The court finds Captain Wyatt's testimony to be credible.

Further, Plaintiff's testimony is materially contradicted by the trial testimony of Marcus Hood, who has served as Deckineer and/or Head Deckhand of the CRIMSON WHITE for about three years, and who served as Head Deckhand aboard the CRIMSON WHITE on August 12, 2007. Specifically, Crow testified at trial that he slipped and fell while bringing one load of drinks from the truck to the dock, that no one was present when he fell, that he attempted to pick up the spilled drinks himself, and that he did not know how the remainder of the groceries were transported to the ship. Crow also testified at trial that, immediately after he fell, he went straight to the galley, where "everyone" was assembled and "told them [he] had fell out there getting onto the boat." However,

10

Marcus Hood testified that he saw Plaintiff pull up in a truck at the dock when he came back with the groceries.  (Hood Tr. Testimony).  Hood stated that he walked over on the bottom deck of the vessel and helped Crow unload the truck.  (Id.)  According to Hood, Plaintiff handed down about six or seven cartons of drinks from the dock to Hood on the lower deck, two cartons at a time.  (Id.)  Hood then walked the drinks back to the galley, making three or four trips.  (Id.)  Moreover, Hood testified that he never saw any drinks spilled on the deck of the vessel, that Plaintiff never told him he spilled any drinks on the deck of the vessel, and that after Plaintiff handed Hood the drinks, Crow "left and went to the boat next door." (Id.)   The court finds Hood's testimony to be credible.

Finally, Plaintiff's testimony at trial is materially contradicted by the testimony of Gerald Bowe, a deckhand aboard the CRIMSON WHITE on August 12, 2007, who is no longer employed by Cooper Marine.   Specifically, Crow testified that when he fell at Wal-Mart, he fell on and aggravated his right knee and did not injure his left knee.  Bowe testified, however, that he witnessed Plaintiff fall at Wal-Mart, and that he "[d]id an awkward split like [his] right foot went out, left foot up under him," that Crow stated after the fall that "his left knee [was] hurting," that he "witnessed it swelling up on [Crow's] knee," and that Crow continued to complain about his knee after the fall at Wal-Mart.  The court finds Bowe's testimony to be credible.

In addition, Bowe testified that Plaintiff called him several times after Bowe offered deposition testimony in this case.  According to Bowe, when the two men spoke on the phone after Crow's repeated calls, Plaintiff said, "I would sure appreciate you helping me out . . . just tell them I hurt my right knee when I fell at Wal-Mart instead of my left knee." (Bowe Tr. Testimony).  Bowe believes Crow was trying to get him to change his testimony.  (Id.)   The Court also finds this testimony to be credible.

11

As laid out above, Plaintiff's testimony regarding the events surrounding his alleged accident aboard the CRIMSON WHITE is materially contradicted in a number of respects by the sworn testimony of Captain Wyatt, Gerald Bowe, and Marcus Hood, as well as by Plaintiff's own testimony.  Because the court credits the testimony of Wyatt, Bowe and Hood over the plaintiff's testimony, the court also finds that Crow has failed to meet his burden of establishing by a preponderance of the evidence that he injured his left knee as a result of falling on Defendant's boat. Accordingly, the Court finds in favor of Cooper Marine regarding Plaintiff's Jones Act negligence and unseaworthiness claims.

Plaintiff's surviving claims for maintenance and cure and additional factual findings pertaining to those claims are discussed below.

### C.    Plaintiff's Medical Treatment, Resignation, and Subsequent Work History

As noted above, Dr. Stephen Andrews conducted a merchant mariner physical examination of Crow prior to his employment with Defendant, on or about January 23, 2006.  (Pl.'s Tr. Exh. 1). The report Dr. Andrews produced following that examination did not identify any physical defect or impairment.  (Id.)  Dr. Andrews certified that Crow was "Competent" and did not impose any medical restrictions on his employment activities.  (Id.).  Dr. Andrews stated that his examination of Plaintiff would have included an evaluation of Crow's musculoskeletal system, including his lower extremities and range of motion.  (Pl.'s Tr. Exh. 10, Andrews Dep. 12:17-22; 14:9-19).

Plaintiff testified that following the alleged accident that forms the basis of this dispute he promptly visited his family physician Dr. Beach, who referred him for treatment of his left knee to a Dr. Davis of Shoals Orthopedic, P.C., in Florence, Alabama.   Dr. Davis' partner, Dr. Nichols, performed surgery on Crow's left knee on August 20, 2007.  (Jt. Tr. Exh. 2).

12

Plaintiff testified that following the surgery Dr. Nichols performed on his knee, he recuperated at home for two weeks and underwent a course of prescribed physical therapy for approximately four to six weeks.  (See also Jt. Tr. Exh. 2).  Plaintiff further testified that after the surgery, he told Dr. Beach, Dr. Nichols, and Dr. Davis that he was still having problems with his knee, that it was "popping," that it "locked up," and that it could not be straightened "all the way out."  Dr. Davis then prescribed another course of two to three weeks' worth of physical therapy. (Pl. Tr. Testimony; see also Jt. Tr. Exh. 1).  Plaintiff testified that he complained post-therapy to Dr. Davis regarding continuing pain, popping, and locking.

Shoals Orthopedic prepared a "Work Status Form" dated September 24, 2007 stating that Plaintiff could  return to work on October 17, 2007 with restrictions on climbing stairs, ladders, or poles and squatting, crawling, and/or kneeling.  (Jt. Tr. Exh. 1).  The form, which was signed by Dr. Davis, appears to have been prepared for fax transmission to Amy Slay, although the record contains no evidence that this fax was actually sent or received.  (Id.)  Amy Slay works as Bob Pittman's assistant in Defendant's Claims Department.  (Pittman Tr. Testimony).

Plaintiff testified that in mid-October Dr. Davis stated that Crow's knee "was about as good as it could be."  (Pl. Tr. Testimony).  Plaintiff also stated that in mid-October he called Douglas Hall at Cooper Marine and told him that he was ready to return to work.  (Id.)  Hall informed Plaintiff that he could not return to work immediately because he was subject to a medical restriction on climbing stairs.  (Id.)  Crow responded "okay," and told Hall that he was resigning.  (Id.)  Plaintiff left a message on Amy Slay's voicemail giving a one-week notice of his resignation effective October 17.  (Id.)

13

On October 15, 2007, Amy Slay sent Dr. Nichols at Shoals Orthopedic a fax[3] stating, "If you could please provide a work status update, I understand Mr. Crow was released to return to work w/o restrictions.  Please call with any questions."  (Def.'s Tr. Exh. 19).    No record evidence indicates that Shoals Orthopedic responded to this fax.

In a letter dated October 19, 2007, Bob Pittman wrote Plaintiff confirming receipt of a voice message that Plaintiff "left with [Pittman's] office on October 17, 2007, in which [Crow] advised that [he] w[as] resigning [his] employment with Cooper Marine and requested that Cooper Marine pay . . . the balance of [his] lost wages from the time of [the] injury."  (Jt. Tr. Exh. 8).  The letter also stated that  "Cooper Marine w[ould] continue to pay maintenance to [Crow] while [they] confirm[ed] with [his] physician that [he] ha[d] reached maximum medical improvement or until . . . [he] return[ed] to other employment."  (Id.)

Bob Pittman testified that Plaintiff called him on October 22, 2007, and stated that he had turned in his one week's notice and he wanted Defendant to pay the balance of his "lost wages." (Pittman Tr. Testimony).  Crow informed Pittman that he was going to take another job where he did not have to climb as many stairs as he had to climb on the Cooper Marine boats.  (Id.)

The parties also introduced a letter from Douglas Hall to Plaintiff dated October 31, 2007 (Jt. Tr. Exh. 9), the same date that Plaintiff claims Defendant ceased to pay him maintenance.  The letter "confirm[ed Hall's] conversations with [Crow] and the messages that [Crow] left on his voicemail on October 17, 2007 . . . ."  Hall wrote to Plaintiff,

> As I previously discussed with you, the last information we received
> from your physician was that you could return to work but that you
> could not climb stairs.  As you are aware and as we discussed, your

---

[3]Defense counsel represented at trial that the fax was found among Shoal Orthopedic's records.

> job as a pilot requires you to climb stairs on the boat. Accordingly, Cooper Marine cannot allow you to return to work as a pilot with the restriction currently imposed by your physician.
>
> ***
>
> You advised in your voice messages on October 17, 2007 that you were going to look for other employment and that you were giving Cooper Marine one week's notice. We regret that you have decided to terminate your employment with Cooper Marine and Cooper Marine accepts your resignation effective as of October 17, 2007.

(Id.).

Bob Pittman testified that Defendant made $20 daily maintenance payments to Plaintiff totaling $1,580 during the time period from August 14, 2007 through October 31, 2007. Pittman also testified that Defendant paid Crow an unearned, supplemental wage of $137/day during the time period from August 14, 2007 through October 17, 2007, which, when added together with the $20/day maintenance payments, equaled 80 percent of Plaintiff's net average daily wage.[4] Cooper Marine did not pay Crow maintenance after October 31, 2007. (Pl. Tr. Testimony). Pittman stated that he decided not to pay maintenance after October 31 because he "had learned that [Plaintiff] had taken another job with another company." (Pittman Tr. Testimony). However, Pittman testified that Defendant paid two advances of future wages totaling $2300 to Plaintiff, over and above the amount Plaintiff was paid as supplemental wages, plus $2610. (Id.) According to Pittman, together these amounts represented the full sum of what Plaintiff would have earned, net of taxes, had he been able to work until he resigned. (Id.) Pittman further testified that Defendant had agreed to continue to pay Crow maintenance and supplemental wages until he received a full release for return to work,

---

[4]Pittman explained that Crow's 52-week gross wages equaled $99,890 at the time of his separation, which equaled an average daily gross wage of $273. Minus taxes and withholding, Plaintiff earned a net average daily wage of $197. Pittman testified that it is company policy to calculate maintenance and lost wages based on an average daily wage rather than by computing actual daily wage times days worked during the period during which maintenance and/or wages may be owed.

and that Cooper Marine paid all of the medical expenses that Crow submitted for payment in the fall of 2007.  (Id.)

Plaintiff testified that he was willing to work in October of 2007, despite his injuries, because he needed to support his family economically.  Crow further testified that he felt compelled to resign because Defendant would not permit him to work in light of his medical restriction on stair-climbing.  Crow believed Cooper Marine was paying him approximately 40 percent of his salary at the time he resigned. (Pl. Tr. Testimony).

Plaintiff returned to full-time work on November 2, 2007 for All-Star Marine Towing ("All-Star")[5] as a full-time pilot[6] and relief captain, with a schedule of 28 days on the job, followed by 14 days off the job, the same schedule that he maintained at Cooper Marine.  (Id.)  All-Star Marine paid Plaintiff $450/day, plus health insurance for Crow and his family, which Plaintiff admitted was a better rate of pay than he received in Cooper Marine's employ. (Jt. Tr. Exh. 4; Pl. Tr. Testimony).  Plaintiff testified, and payroll records admitted at trial show, that Plaintiff continued to work for All-Star through February 5, 2009.  (Id.).  All-Star laid Plaintiff off in February of 2009.  (Pl. Tr. Testimony).

After Dr. Nichols operated on Crow's left knee and he was released by Shoals Orthopedic, during the time period from November 16, 2007 through February 5, 2009, Plaintiff continued to

---

[5]Plaintiff and Defense Counsel occasionally refer to "All-Star Marine" as "All-American Marine" at trial.

[6]Plaintiff testified that he worked for All-Star on a part-time basis beginning sometime in or before June, 2007.  Plaintiff also testified that he completed the employment application contained in Joint Trial Exhibit Four, which is dated August 15, 2007, after he had begun to work part-time for All-Star but before he began full-time work for the company in November of the same year.  He repeatedly stated that this application was "sent to him on the boat" before he hurt his knee.  (Pl. Tr. Testimony).

see Dr. Beach for treatment of pain related to his injured left knee.  (Pl. Tr. Testimony; Pl.'s Tr. Exh. 12, Beach Dep.27: 9-29: 15; Jt. Tr. Exh. 5).   Evidence suggests that, around this time, Plaintiff decided to stop treatment with Doctors Davis and Nichols:  on December 3, 2007, Crow missed a scheduled appointment with Shoals Orthopedic.  (Jt. Tr. Exh. 1; Def. Tr. Exh. 20, Nichols Dep. 42: 13-43:4).

 In January of 2009, Dr. Beach referred Plaintiff to Dr. Solorio, the same physician who had previously operated on Crow's right knee.  While Dr. Solorio was treating Plaintiff for left knee pain, ChibbCo Equipment ("ChibbCo") hired Crow as a part-time trip pilot beginning March 4, 2009.  (Pl. Tr. Testimony).  Plaintiff earned $500 per day while working for ChibbCo.  (Id.; Def.'s Tr. Exh. 15, ChibbCo Employment Verification Letter).  Crow did not seek full-time employment during this course of treatment with Dr. Solorio because he hoping to be hired by Ingram, a large company with towing operations based in Paducah.  (Pl. Tr. Testimony).  Plaintiff was released from ChibbCo on March 12, 2009 on account of his knee pain and the knee surgery he anticipated.  (Id.)

On March 27, 2009, Dr. Solorio performed surgery on Plaintiff's left knee.  (Jt. Tr. Exh. 6). Plaintiff testified that he spent the first week after surgery recovering at home, eventually began using crutches, and underwent a course of prescribed physical therapy.  Dr. Solorio's records indicate that he released Plaintiff to work without restriction on May 5, 2009.  (Id.)

Plaintiff testified that after the surgery Dr. Solorio performed, his left knee was "doing a lot better."  On May 5, 2009 Dr. Solorio saw Plaintiff at his office.  (Pl.'s Tr. Exh. 13, Solorio Dep. 23:18-19:4).  During that visit, Dr. Solorio released Plaintiff to work without restriction and instructed him to continue taking anti-inflammatory medication.  (Id.).  Plaintiff stated that he returned to work following Dr. Solorio's release, and that he made one trip with ChibbCo between May 5, 2009 release and the date of trial.  Dr. Solorio testified during his deposition that he would

17

make a final assessment regarding Plaintiff's maximum medical improvement during Crow's office visit in early July of 2009, and stated that he saw no reason why Crow would not be at maximum medical improvement six weeks after the date of the deposition, around the end of June.  (Def.'s Tr. Exh. 21, Solorio Dep. 31: 2-18)  At trial, Plaintiff was able to ambulate without any other assistive device(s), and testified that his pain level was "about a two."

### D.   Maintenance and Cure

#### 1.   The Court's Previous Findings

Although the finding was not essential to its ruling on Plaintiff's motion for partial summary judgment, this Court previously determined that from August 12, 2007, to October 17, 2007, Defendant paid maintenance to Plaintiff in the amount of $1,300.00, cure and medical expenses in the amount of $9366.22, and unearned wages in the amount of $11,507.60.  (Doc. 39).

#### 2.   Maintenance

The court finds, based on the testimony of Bowe, that Plaintiff was in the employ and service of Defendant when he injured his left knee in the Walmart store parking lot.  Specifically, the plaintiff injured his knee while purchasing supplies for the CRIMSON WHITE voyage.  (Bowe Tr. Testimony; Pl. Tr. Testimony).

The parties have stipulated that, during the time period it was paying maintenance, Defendant paid Crow $20/day.  (Doc. 73).  From August 13, 2007, the day after Crow left the CRIMSON WHITE until October 31, 2007 amounts to a period of 79 days.  Bob Pittman testified at trial that Defendant paid Plaintiff $1,580 in maintenance, which would equal 79 days' worth, at a rate of $20/day.[7]  Cooper Marine did not pay Crow maintenance after October 31, 2007.  (Pittman Tr.

---

[7]In addition to maintenance, Bob Pittman testified that Cooper Marine paid Crow a supplemental, unearned wage that the Defendant was not required by law to pay.  (Pittman Tr.

Testimony).  Plaintiff presented no evidence contradicting Pittman's testimony regarding the dates during which Defendant paid maintenance.

Based on the evidence presented at trial, the Court concludes that Defendant duly satisfied its obligation to pay Plaintiff maintenance during the time period from August 14, 2007 through October 31, 2007.  The Court further finds that Cooper Marine would have continued to pay Plaintiff maintenance had he not resigned to accept higher-paying employment.

Immediately thereafter and through February 5, 2009, Crow was employed by All-Star in his accustomed trade at a higher rate of pay than he received at Cooper Marine.  As a result, Cooper Marine does not owe Plaintiff maintenance during the time period from November 1, 2007 through February 5, 2009.

Crow was unemployed and receiving medical treatment from February 6 through March 3, 2009.  Defendant owes Plaintiff $20 daily maintenance for that 26-day period, and the payments owed for that period total $520.

From March 4 through March 12, 2009, Crow worked for ChibbCo in his accustomed trade at a higher rate of pay than he received in Defendant's employ.  Cooper Marine does not owe Plaintiff maintenance for this time period.

The evidence shows that Crow was convalescing and undergoing surgery from March 13 through May 5, 2009, when Dr. Solorio released him to work.  Defendant owes Plaintiff maintenance totaling $1060 for this 53-day period.

---

Testimony).  Because the Court finds that Defendant is not liable for negligence or unseaworthiness, no discussion of the amount and calculation of Plaintiff's supplemental wage is necessary.  Defendant represents that it paid Crow a total of $11,107.60 worth of supplemental wages, wage advances, and wages net of taxes.  (Pittman Tr. Testimony; Jt. Tr. Exh. 8, October 17, 2007 letter from Pittman to Pl).

The Court concludes, based on Dr. Solorio's estimate, Crow's statements regarding his condition at the trial on July 9, 2009, and Plaintiff's statements in his post-trial brief, that Crow reached maximum medical improvement on June 30, 2009.

Plaintiff testified that after he was released to work on May 5, 2009, through the date of trial, he made only one trip with ChibbCo. The only evidence before the Court regarding the length of Plaintiff's trips with ChibbCo is found in the Employment Verification Letter introduced by Defendant at trial. (Def.'s Tr. Exh. 15). The letter indicates that Plaintiff worked 14 days on and 7 days off for Chibbco. (Def.'s Tr. Exh. 15).

Accordingly, the Court finds that Defendant owes Plaintiff maintenance during the 56-day period from May 5 through June 30, 2009, the date he reached maximum medical improvement, excluding a 14-day period during which Crow was tripping for ChibbCo. Thus, for the time period from May 5 through June 30, 2009, Cooper Marine owes Plaintiff 42 days' worth of maintenance, which amounts to $840.

The Court finds that Cooper Marine owes Plaintiff a total of $2,420 in unpaid maintenance.

### 3.   Cure

Cooper Marine was required to pay for the care and treatment of Plaintiff's left knee from the alleged date of his injury, August 12, 2007, through June 30, 2009, the date he reached maximum medical improvement. Plaintiff does not list a claim for cure among the pecuniary damages he enumerates in his post-trial brief. (Doc. 84).

The parties have stipulated that Defendant paid for Plaintiff's post-injury medical treatment by Dr. Nichols and Dr. Davis at Shoals Orthopedics, P.C., as well as Plaintiff's associated rehabilitation at Encore Rehabilitation, Inc. (Doc. 73).

After he began work at All-Star in November, 2007, Crow did not make any demands for

recommencement of maintenance and cure from the time he resigned from until January or February of 2009 (Pittman Tr. Testimony; Pl. Post-Tr. Memo; Def. Post-Tr. Br.), when Plaintiff's counsel requested that Cooper Marine pay Crow's expenses in connection with the treatment he was receiving from Dr. Solorio.  (Pittman Tr. Testimony).

Upon notification that Dr. Solorio had diagnosed and intended to treat a torn meniscus in Plaintiff's left knee, Bob Pittman testified that Defendant agreed, without prejudice or waiving any defenses, to pay for Plaintiff's treatment, pending investigation of Crow's medical status. (Doc. 73). Crow testified at trial that as part of Dr. Solorio's pre-surgical treatment of Plaintiff's left knee, an MRI was performed at Parkway Medical Center.  Plaintiff claimed for the first time at trial that Defendant had not, as of the date of trial, paid the MRI bill for some $5,200, and that Plaintiff had been sent to a collection agency as a result.  Defense Counsel, while reserving all rights and defenses, indicated at trial that Defendant would pay the MRI bill.  Bob Pittman testified that the MRI bill had gone unpaid because he had requested, but not received, an invoice detailing the payment terms. Cooper Marine avers in its Post-Trial Brief that it has paid the MRI invoice, and Plaintiff does  not argue to the contrary in his Post-Trial Memorandum.  (See Docs. 84, 87).  The Court concludes on the basis of the evidence adduced at trial and the parties' post-trial briefs that Defendant has in fact paid for Dr. Solorio's care and treatment of Crow's left knee.  (See id.).

Defendant is not obligated to compensate Plaintiff for any treatments with Dr. Beach for which it has not already paid.  At trial, Plaintiff presented no evidence establishing the amounts it claimed Cooper Marine owed for Crow's treatment with Dr. Beach.  This Court's review of Dr. Beach's chart records dating from the disputed period of October 15, 2007 through January 29, 2009 suggest that only on a couple of occasions did Crow visit Dr. Beach's office with the primary purpose of obtaining treatment for his left knee.  On those visits, Dr. Beach merely renewed or

reevaluated Plaintiff's pain prescriptions and/or referred him to Dr. Solorio. The evidence submitted does not support an award of cure for Crow's treatment with Dr. Beach.

Moreover, Plaintiff's Post-Trial Memorandum did not include a claim for cure. (Doc. 84). To the extent that Crow seeks to maintain a request for unpaid cure, his claim is **DENIED**.

### 4.   Attorney's Fees and Punitive Damages

Plaintiff's request for attorney's fees is **DENIED**. There is no evidence that Defendant acted "in bad faith, callously, or unreasonably" when it ceased to pay Crow maintenance and cure. On the contrary, Cooper Marine's employee Amy Slay contacted Plaintiff's doctors in an effort to clarify his readiness for work. Cooper Marine dutifully paid maintenance and cure until it was informed that Plaintiff was resigning to seek more lucrative employment. Crow did not make any additional requests for maintenance and cure payments until after he filed this suit. Once Plaintiff demanded cure, however, Defendant agreed to pay it pending the outcome of this trial.

At trial, Plaintiff requested leave to amend his Complaint to add a claim for punitive damages based on the Defendant's allegedly wrongful refusal to pay maintenance and cure, in light of the Supreme Court's recent decision in Atlantic Sound & Co. v. Townsend, 129 S.Ct. 2561 (2009). This Court denied Plaintiff's request, noting that trial had already begun and that Plaintiff's request for leave to amend was untimely.

In his post-trial brief, Plaintiff attempts to resurrect a claim for punitive damages. Plaintiff's request is denied for the reasons stated on the record at trial and those explained immediately above in the course of this Court's discussion of Plaintiff's claim for attorney's fees. Defendant's refusal to pay maintenance and cure after Crow's resignation was not "wanton and willful," especially in light of the fact that "[f]ederal courts are in disagreement as to whether the right to maintenance and cure extends [after] a seaman [is] re-employe[d] in his accustomed trade." 86 A.L.R. Fed. 392, §

2(a).

IV.    **Conclusion**

The Court finds in favor of Cooper Marine regarding Plaintiff's Jones Act negligence and unseaworthiness claims.  Defendant's Motion to Dismiss Plaintiff's claims is hereby **GRANTED in PART**, to the extent it seeks dismissal of Plaintiff's Jones Act negligence and unseaworthiness claims; the remainder of the motion is hereby **DENIED in part**.

Based upon the foregoing, it is hereby **ORDERED, ADJUDGED** and **DECREED** that **JUDGMENT** is entered in favor of Plaintiff and against Defendant for maintenance, and the amount due to Plaintiff and to be paid by Defendant is $2,420.

Plaintiff's requests for attorney's fees and punitive damages are hereby **DENIED**.  Each party shall bear its own costs and attorney's fees.

Thus, the Court finds that Plaintiff is entitled to recover the total sum of **$2,420** from Defendant.

**DONE** and **ORDERED** this the 2nd day of September, 2009.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**